Is counsel present for the Wedeco-Calgon case? I trust you left the parasites at home. We don't have samples. This is case number 06-1547 Wedeco UV Technologies v. Calgon Carbon Corporation. Mr. Valencia, tell me if I pronounced your name correctly. It is correct. Good afternoon. May it please the court. The precedence of this court requires that the determination of the court below on summary judgment that all of the preambles of all of the claims of both Calgon Carbon patents are not limitations of those claims and that those claims are invalid as anticipated and inherently anticipated. The view of the prior art must be reversed. Even if the preambles are meaningful and part of the claims, why aren't they anticipated by the references, particularly ransom, which certainly talks about cryptosporidium? The ransom reference is an example of the use of ultraviolet light and cryptosporidium. However, there are several issues with regard to the ransom reference. Firstly, the ransom reference says nothing about what the preamble is discussing, the prevention of infection from cryptosporidium or the prevention of replication of cryptosporidium. But is it your position that there has to be a presence in the water that is being tested of these organisms? In order for the claims to apply, cryptosporidium must be present in the water. Well, and so, for example, in the Fort Howard situation, if they were not present on a Monday, there'd be no infringement. But if there was a heavy storm that night, and by Tuesday some of them work there, then there would be an infringement. It seems to me hard to believe that the meaning of these claims and their application varies depending on such consideration. Isn't the whole purpose of this that you'd want to treat the water to make sure that these organisms are not in the water? And you don't look and say, well, let's count how many there were and such, etc. Now, in point of fact, the claims are the invention of the Calvin-Carton patterns, as evidenced all the way through those patterns, from the title, through the abstract, through the objects, background, examples, etc., is the irradiation of cryptosporidium. Indeed, the examiner, initially in the 1893 patent, made reference to this, where she was distinguishing a prior patent to Dunn. And she said, Dunn teaches the use of pulsed UV for water treatment, and in fact teaches one of ordinary scaline art away from using the UV radiation of the present invention for treatment of water containing C. parvimor cryptosporidium. Clearly, the examiner was giving weight to the preamble, and the understanding of the examiner was that the invention related to the application of UV light to water containing cryptosporidium. Without cryptosporidium, there is no infection. You must have cryptosporidium in order to have infection. If there is no cryptosporidium, there is nothing to prevent. And importantly here, cryptosporidium is not an inherent event. There are some waters where it may exist, and other waters where it does not. So it's not like in some of the cases where you have an inherent condition that's going to happen each and every time as a natural consequence of the object, or characteristic of the object, or the natural consequence of performing a procedure in the prior art, or the natural consequence of taking a medication and forming a metabolite, inevitably as a matter of physiology. Cryptosporidium is not inherent. And so to say you could apply this claim in the circumstance where cryptosporidium is not present would be, for example, the ability to charge someone with infringement who never has cryptosporidium. You're focusing very strongly on the specific wording of the claim in the preamble. Let's read it. A method for the prevention of cryptosporidium oocysts. How do you prevent the presence of? No, that actually... Or prevent them from invading or from being introduced? And didn't the ultraviolet light in the prior art do that? No. The phrase for the prevention of cryptosporidium oocysts. You are not, of course, preventing the existence of them. You're not physically removing them. You're keeping them out, keeping them from being viable. From being viable in the sense that once they are irradiated they cannot go through their life cycle. Cryptosporidium is what's called an obligate... And the UV light described in Ransom did that. We don't know that because there is no demonstration from the Ransom reference of lack of infectivity. She used a test called Existation, and that is not an infectivity test. That's an in vitro test. And, indeed, it's been acknowledged by both sides that those tests don't show anything with regard to infectivity. So, in fact, there is no showing to what a skill we are that the application of UV light, even accepting what Ransom says at face value, and there's hotly contested issues here as to what Ransom does disclose to what a skill we are, but even taking it at face value, there is no showing, no demonstration in Ransom. And no one ever said, Eureka, your Ransom has now demonstrated the application of UV light to prevent infection. Indeed, in a paper the very same year as Ransom, a paper by Lorenzo Lorenzo, he performed an experiment very similar to Ransom with a Petri dish and low-pressure UV light, and he did use a mouse infectivity model which actually does show whether the crypto are infectious. He did a control to show that they were infectious to start with, and then he irradiated them at different dosages, at different levels, at different times, and then fed them to the mouse to see whether they would infect the mouse. And he determined that at doses of less than, for example, 300, when you look at it, there's a third-party reference that tells you what the doses were, he showed that at doses that perhaps would have been given by Ransom, there was either no or little prevention of infection. And so when Kelly says, well, if Ransom had only taken those irradiated crypto and put them into a mouse, they would have inevitably seen that there was prevention of infection. In fact, Lorenzo Lorenzo did the very same thing and didn't get prevention of infection. Another paper by Dr. Jennifer Clancy, who is figured prominently in this case and is a person of skill in the art, I think we all agree, in handling crypto and applying ultraviolet light. In 1998, five years after the publication of the Ransom paper, irradiated cryptosporidium using a low-pressure lamp at doses of about 180 millijoules, which is slightly above the claim range of the Calabon patents. She used a vital dye test and found no activity, or no loss of activity whatsoever. No result whatsoever. So what this demonstrates is that contrary to the assumption that Ransom must have inevitably performed this invention, in fact, the application of ultraviolet light as claimed does not inherently result in the prevention of infection by cryptosporidium. The situation is even clearer in Fort Benton because, as I said, cryptosporidium is not an inherent pathogen or inherent contaminant of the water. It may or may not be present. Fort Benton is a groundwater source. The EPA has said that groundwater is unlikely to contain cryptosporidium and that's why the EPA historically has allowed municipalities to use ultraviolet light on groundwater under the belief that crypto is not going to be there. And what the ASI regulations have said historically is that if you are using UV where you think there might be cysts and cryptosporidium would be an example of a cyst, you must remove them. You must physically remove them. You have to filter them out. Let me ask you a somewhat different hypothetical because suppose someone were to discover that taking certain doses of aspirin would cure liver cancer. Would that be patentable? Well, the cases are clear that you may not patent that which is inherent in the prior article. No, but that's my hypothetical. Why isn't this a new use of an old product in my hypothetical? Well, it is a new use of an old product. Is that patentable? Yes, so long as it is new and unobvious, you certainly can patent it. Well, it's a new use. Previously aspirin was generally used as an analgesic and here it's being used to cure liver cancer. What I'm suggesting to you is I think the line between a new use of an old product and a use that is inherent in the prior old use is a difficult line to draw and difficult to grasp. The whole concept of something is inherent. In my hypothetical I suppose also one could say it was inherent that if you took aspirin in these amounts it would cure liver cancer. It just hadn't been discovered up until some point. But one would have to say that aspirin used as an analgesic. Liver cancer is not coterminous with the reason why someone is taking aspirin. So unless those conditions are... But isn't the inherency in the use of the product rather than inherent in the condition of the human body, that is it's inherent. If I take aspirin in a certain dosage it seems to me you could say it's inherent that it will cure liver cancer. But that is not the standard on which inherent anticipation is judged. In the hypothetical that you pose aspirin taken in the prior art may have been taken for a different reason. However, the fact that it also may cure a different disease state, so long as that is novel and unobvious, you may in fact obtain a patent on the new use of aspirin for the treatment of liver cancer. That is absolutely permissible. It is only when the use in the prior art is anticipated such that it was given to people in the past. Well surely people must have been given aspirin who had liver cancer and took it as an analgesic. Well, that's possibilities and probabilities. And isn't that inherent? No, it's not inherent. Even if it was undiscovered? Well, the fact that it was discovered or undiscovered I think is irrelevant. You can have anticipation where those practicing in the prior art were unaware. I think that's clear from the precedence of this Boyd to Sharon case and so forth. So that's clear. But to say, well, someone who took aspirin in the past must have had this condition. That's engaging in impermissible probabilities and possibilities. That does not constitute inherent anticipation. Let's save your rebuttal time and let's hear from the other side. Mr. Young. Good afternoon, Your Honor. Thank you. At the bottom of the question is whether the Calgon patent describes a new use of an old process. Not an old thing or apparatus, but an old process. And I think we can all agree that enabling an old mousetrap to catch a new species of mice is probably not a new use. Putting an old scarecrow in the backyard... That's obvious and it's not anticipation. Well, is it? It's so close. It's so analogous and so close. All of the same mechanisms are present that indeed under the cases it does appear to be inherent anticipation. Anticipation is novelty. There may be a very strong argument with respect to obviousness. Anticipation requires identity. One can argue about whether it was inherent and undiscovered and so on, but that which is undiscovered and whether it can or can't be claimed in any form, it still has to be the same. Substantial identity, indeed. And I believe that is exactly what we have here under three cases that kind of define a pattern. The barricode case, the Bristol-Myers-Squibb case, and the most recent case from last November, the Abbott Labs case. What we have there is a ruling to the effect that a newly discovered result of a known process performed in furtherance of the same purpose does not make the process a patentable new use. That gets us to the preambles, doesn't it? You're saying the process steps are clearly old. Absolutely. Irradiation, certain doses. It's a single-step process and it's identical. But what do we do with the preambles? I don't think it matters. And the district court judge came to the same conclusion. I don't really think it matters. And what it amounts to is this. Why? Because even the preambles are anticipated? Even the preambles are certainly anticipated by ransom, but I think they're anticipated by Fort Benton as well. When you look at the prior art, what you've got is the exact same process being used to inactivate a whole group of pathogenic microorganisms that respond to the low doses of ultraviolet radiation in exactly the same way that cryptosporidium responds to it. Namely, their DNA is scrambled so that they're no longer infectious and they can't replicate. This is the... And as far as cryptosporidium is concerned, some people said, well, it doesn't look like for sure. All these other microorganisms are inactivated by this ultraviolet radiation in the low dosage, but it looks like for cryptosporidium we might have to jack it up by 10 or 15% in order to inactivate them. They were wrong. You don't have to jack it up to inactivate cryptosporidium. That was the discovery of Jennifer Clancy prior to the invention of the patents in Sioux, and Jennifer Clancy handed that to Drs. Bolton and Stevens. Jennifer Clancy is not an inventor in the patents in Sioux. She handed that to them, and voila, out comes the invention. Oh, we were wrong. Everyone was wrong. The low-dose ultraviolet radiation treats cryptosporidium just exactly like it treated all of the other pathogenic organisms that have previously been inactivated using exactly the same method. Now, one of the cases that... And two factors. First of all, there's a strong argument here that running against conventional wisdom is a big factor in this case. That argument was dispensed with in the Abbott Labs case. That was exactly what was dealt with there. It was the argument that was put forward that, boy, when you saturate this material with water, you just don't want to do that. That runs against conventional wisdom, and that's exactly what the later inventor did. That argument was brushed aside. But let's look at the Paracon case, which I believe Calgon relies on fairly heavily. There were two groups of claims that were involved in Paracon. You remember, we had a lotion that was in the prior arc that was applied topically to the skin to prevent the effects of aging. That was the prior arc. The patent claimed to apply the exact same lotion to the skin to prevent sunburn. This court said they're not identical. It's not that dead-on identity, but the court said it's so close under the language of Ansonia Brass. Remember, it talks about analogies, things that are so close as to be essentially the same, that those claims are anticipated. On the other hand, the claims that were drawn to the application of the lotion to treat a pre-existing condition of sunburn were not. And again, the ruling was, well, frankly, I think it was a close call, but the ruling was there's enough of a difference there. Well, there the process steps were the same, right? The process steps were the same. Only, arguably, the preamble in terms of the result, possibly unappreciated, was different. Right. I think Fort Benton is a 102 anticipation right on the money. You've got the Missouri River is the source of water for the Fort Benton treatment system. The Missouri River is an open water source that runs through farmland where livestock activities are present, and it is undoubtedly infected with cryptosporidium. The argument there was that the Missouri River bottom was an absolutely reliable filter for cryptosporidium. So, regardless of the fact that it was in the river, it didn't get into the system of water that was being treated. I have a question. Is Fort Benton truly an anticipation case? It seemed to me it was more like a prior public use case. It was a prior public use, but I believe it was anticipation in the 102A sense. Well, I thought the general principle of anticipation is that all the limitations in the claim have to be disclosed in a single reference. What was the single reference at Fort Benton? The plant? It would be the plant and the use of it, yes. Exactly. The public use of the plant that was being used to treat water that was drawn from the Missouri River. And the exact same method was being used. It was low-dose ultraviolet radiation being used to inactivate these waterborne pathogens. But they didn't know whether they had crypto in the water or not, despite the fact that it was generally known, particularly by the EPA, that there was cryptosporidium in the Missouri River. That it met all the definitions of whether or not there'd be cryptosporidium in the water. Now, the question is, can... Calgon has no proof that there wasn't cryptosporidium getting into the water system at Fort Benton, just as Wetiko has no proof that there was. But it's a highly probable situation that crypto got into the water as evidenced by the testimony of the superintendent of the Fort Benton system in the Canadian lawsuit, where he said that in 1995, as a result of going to a symposium on the use of ultraviolet radiation to decontaminate drinking water, I found out about this Milwaukee outbreak, and the much higher level of awareness of the threat of cryptosporidiosis in drinking water supplies. And so I called my supplier of the water system, the people who had furnished the Fort Benton system in 1987, and who had guaranteed him at that time, 10 years prior to the Calgon inventions, that the Fort Benton ultraviolet system took care of all known waterborne pathogens. Calls him up in 1995 and said, Am I covered for cryptosporidium? And they said, Yes, you are. It covers everything. So now, does that constitute absolute, dead certain proof that there was cryptosporidium coming into the treated water at Fort Benton? No. But it certainly constitutes a state of mind by the superintendent of the system that I am using my system as a cryptosporidium barrier. Isn't the real question whether, under the language of this claim, there has to be a presence of these microorganisms at the time the ultraviolet rays are applied? That is, it seems to me, you say there doesn't have to be and therefore, it doesn't really matter whether they did or didn't prove it. The other side says, no, when you look at this it's a method for the prevention of infection from these items found in drinking water. And they say, if it isn't found in the drinking water, the claim doesn't cover it. If you look at these claims objectively, there are two patents and two sets of claims. The 893 patent, which is the first patent to issue, does not require the presence of cryptosporidium in the water. There's nothing in the claim that specifically says that. Nor does it require... Except for the language found in. Claim 1 of the 893 patent? Claim 1 says found in. That's the one that Judge Rory asked about, a method for the prevention of cryptosporidium oasis. A method for the prevention of infection. That comes only in the 803 patent. Now you've got, and the only claims, objectively read, the only claims that specifically call for cryptosporidium in the treated water are claims 13 and 14 in the 803 patent. All the others are just prevention claims. It might be there, it might not be there. And again, we have to look at a number of things. Calgon sued North Bay, the city of North Bay, Ontario, tried a whole case up in Canada. No proof anywhere that there was cryptosporidium in the water treated at North Bay. They sued, they counter-sued Wetico here in the United States for infringement of all these claims. No proof whatsoever that there was cryptosporidium in the water. Their expert, Dr. Charette, testified in Canada that, well, there's infringement if the method is being practiced in a standby mode, meaning, well, there doesn't have to be cryptosporidium in the water at any time. What does that have to do with anticipation? The point is that with respect to these claims, the patent owner itself is now brushing aside the requirement that there actually be cryptosporidium in the water. They're saying, basically, this is a threat type thing. This is a risk. We're not infringing, we don't have this problem, so how can you charge us with curing or preventing the formation of the oasis? Well, prevention is a term to be looked at on its own. Inoculation of children for the prevention of smallpox in mumps does not presume that the next day they're going to be exposed to it, that they're ever going to be exposed to it. And yet, any normal interpretation of the language would be that an injection or an inoculation for the prevention of a certain disease is meaningful whether there's exposure to that disease or not. Then why isn't this meaningful? Treatment in order to prevent the formation of the oasis. Oh, you're not preventing the formation of oasis. Oasis are the microorganisms. They are there. That is the microorganism. The oasis is not the result of any kind of transformation. It's the reproduction of the oasis. Well, what happens is the oasis is like a little ball. It's a little shell that this microorganism travels in. Once it gets into the system, the shell opens and three or four little worm-like critters on the inside are released. They're called sporozoites. And those are what replicate or reproduce in enormous numbers inside of a host and cause the infection. But it's their DNA which is affected by the ultraviolet light. Exactly. It is inherent that this low dose of ultraviolet light doesn't kill these things. It simply makes them impossible to replicate. That was really my question. How can it be inherent if in fact there are no oasis to start with? Well, it's inherent that you're preventing something. The scarecrow in the backyard... You just explained to me that I had the chemistry, the biochemistry backwards. But now you're telling me you're preventing something that's not there to start with. Yes, and I think if that is the objective of the method, that is exactly what you're doing. If you put the scarecrow in the backyard to prevent black birds from coming, you're doing so... But let's talk about this case. The fact that there's a UV irradiation plant somewhere along the way doesn't control what the composition is of the water that's moving towards that plant. That's correct. So how are you preventing oasis in that feed water? If there is a risk of contamination of the water and you're practicing a method that is known to eliminate that risk and all parallel, analogous risks, you're preventing infection. You are preventing replication. You are preventing exactly what the process was designed to do. I thought you explained to me that you're not preventing the oasis. You're preventing their opening and infecting. That's the... We're moving from claim interpretation now to what is meant by prevention in the prevention claim. No, prevention isn't the word in the claim. That's really what we're debating. In terms of anticipation, it really hinges on whether it's there, isn't it? Whether you prevent it, whether it's there anyway, whether you're preventing something that doesn't have to be prevented because it wasn't there to start with. It's kind of a question about is there a noise if a tree falls in the woods and there's nobody there to hear it? There is a question of is your water contaminated if the contaminant is not present? I think that's a different question. Yes. But at the end of the day, the question is whether Calgon has made a contribution to the sciences and useful arts in discovering that... The only question is anticipation, not obviousness, not inventive step, not contribution. It's anticipation. Yes. And anticipation can be by analogy or parallel or something that, from the Perricone case,  with the result and objective of the known process as to be essentially the same. So anticipation means that it is not novel. Correct. Not by analogy, not by anything else that gets into Section 103, other aspects of the patent statute that this judge did not get to. That would be a very, very strict interpretation of inherency law, and it doesn't seem to fit at least how I read Perricone or Abbott Laboratories or Bristol-Myers Court. Okay. Thank you. Mr. Polansky, you have a few minutes. Yes, thank you. Judge Friedman, just to look back to your question, you had posed that aspirin analogy, teed it up for me a bit, and I didn't pick it up immediately, but the Rappaport v. DeVint case, that was a situation where there was a publication limited to the treatment of anxiety, and the new claim was for sleep apnea, the same medication, and in fact the holding there was that patients weren't shown to have been suffering from sleep apnea, so the claim to sleep apnea for that medication was in fact patentable. As to public use of the Juicy Whip decision that was cited below, you must perform all of the elements of the claim. What happens in the prora must be an embodiment of the claim. Fort Benton is not an embodiment of the claim, or at least there is an issue of fact here, and probabilities and possibilities or strong possibility is not inherent in anticipation. You may have a probability or possibility of the presence of the infection in the water, but if in fact it's present, is it not invariably, according to this invention, destroyed, whatever the word is, of the prevention of the impact on the DNA in the oocyst? Well, that's what I was postulating earlier. You do not have infection unless you have the presence of cryptosporidium. The application of ultraviolet light to cryptosporidium does not necessarily, under all conditions, result in inactivation. Things like low of crypto, the particular particulates in the water, the quality of the water, the piping, how fast it's going through. There are many, many factors, their expert and our expert agree, come into bear in determining what dose and whether or not you're getting efficacy. You cannot assume, and the water treatment plants today all have a very strict qualification to ensure that there is... But the claim has a dose limitation. It's quite broad, but it's stated to be effective within that range. Well, no. I think there's a limitation or a range that is stated, but that is not a guarantee that there is prevention of infection everywhere within that range under every set of conditions. It may or may not, depending on the conditions that you have in use, but the range of 10 to 175 is not a representation or a guarantee, and it's recognized. You might apply 20 millijoules in any given situation and not achieve prevention. You may have a lot of cryptosporidium in a particular facility, and you need a greater degree of prevention or a greater degree of UV in order to effectuate prevention. So it is case-specific. In other words, unless an alleged prior art reference is shown to work in all cases, there's no anticipation? Well, it needs to be shown to work, and it can't be assumed to work. So in the situation like we have with ransomware, since there is no explicit showing of prevention of infection, you can only fill that gap with inherency. And so we must be able to say, well, from that disclosure, would you get prevention of infection? And what I'm positing is you cannot assume that. It depends on the circumstances. The prevention of infection is not an inherent result, just like the presence of cryptosporidium is not an inherent characteristic. So at Fort Bend, at most there is an issue of fact. There is, in fact, I believe, a strict identity test. The Trimtech case refers to strict identity there. It was a color photocopier compared to a photo printer. And the decision there said even though that might be a minimal difference and it might be obvious to one of skill in the art, in fact, it is a little bit different and failed the strict identity test. It may at most be obviousness, but obviousness is not inherency. Okay. Thank you, Mr. Berlanti and Mr. Young. Thank you very much. The case is taken under submission. Thank you. All rise. Thank you.